## DAHNKE v HUNT

Ohio Appeals, 6th Dist, Erie Co

Decided Oct 13, 1936

Young & Young, Norwalk, and A. S. Close, Sandusky, for appellee.

King, Flynn & Frohman, Sandusky, for appellant.

## OPINION

By OVERMYER, J.

On July 19, 1934, Henrietta K. Dahnke, appellee, then about 66 years of age, as plaintiff, filed an action in the Common

Pleas Court against appellant, P. N. Hunt, doing business as Hunt's Quality Market, as defendant, seeking the recovery of damages for injuries alleged to have been sustained by her as a result of a fall on a wet and slippery floor in the store of defendant on June 5, 1934, in the city of Sandusky, Ohio. An amended petition was later filed, issue was joined and on trial the plaintiff recovered a verdict for $2,500, on which judgment was entered. This proceeding is brought to reverse that judgment.

Errors assigned by appellant are the overruling of his motion for a directed verdict, both at the close of appellee's evidence and at the close of all the evidence; that the verdict is not sustained by the evidence and is contrary to law, and error in the charge to the jury.

The amended petition charged negligence against the defendant in that: "through his employees he invited and requested the plaintiff to enter said store when the floor therein was in a wet and dangerous condition; that the dangerous condition consisted in this, that said floor had just been wet with a combination of water and soap or water, soap and other substance, * * * that the defendant's employees were in charge thereof and had full knowledge of the exact condition of the floor; that this plaintiff had no knowledge whatsoever of the condition of the floor except such as was given to her by the defendant; that the defendant notified, apprised and invited this plaintiff to enter and go upon said floor with the full knowledge of the facts about its condition."

It is further charged that the work of washing the floor and placing a soapy, watery and slippery substance thereon was done shortly before plaintiff entered the store, and that the work was done in such manner as to cause the floor to be in a dangerous condition.

The plaintiff testifies that on the date alleged she went early to the store in question, so early that she was not sure it would be open; that when she arrived at the front of the store two employees were at the door which was open, and were scrubbing out water and soap suds from the inside, one with a hose and the other a broom or "squeegee," out of the vestibule and down over the walk into the gutter or "ditch," as she described it; that she thereupon said to them: "Why don't you scrub your store at night?" and that one employee replied: "The NRA don't allow us to do that," and that she then said: "Well, is it all right to go in the store?" and that one employee

said: "Yes, go in and buy anything you want, if you have got the money."

This conversation is denied in toto by both employees, who, on the contrary, both testify that they warned plaintiff not to go in because they were cleaning and mopping and the floor was wet and that they told her to wait a while.

The plaintiff testifies that she entered the store at once after the conversation she claims took place, and that as she entered the store there was a third young man employee inside who stepped aside to let her pass and that he had either a mop or broom in his hands; that she walked to the meat counter in the rear of the store along one side of the center aisle, which was described by the defendant as being 8 or 9 feet wide, and purchased some meat and gave the clerk a dollar bill for the meat and he said: "Have you got the change? The store isn't open yet, the proprietor isn't here"; that she thereupon paid for the meat with exact change; that the floor on the way back was wet and had been scrubbed; that she then started to walk toward the front of the store but along the opposite side of the center aisle along the vegetable counter with a view of purchasing lettuce, and after proceeding some steps she slipped and fell; that the place she was walking at the time was wet. The following excerpts from plaintiff's testimony are pertinent:

"Q. What was the condition of the floor at the place where you fell? A. Wet.

Q. Was it wetter or drier than it had been when you walked in? A. More like soapy—

Q. Do you know what kind of stuff it was that was used? A. Gold Dust,—I saw it swimming in the ditch."

On cross-examination, she testified among other things, as follows:

"They had mopped on the inside and that fellow, I presume he was bringing water out, and when I came in he stood there with that mop or squeegee or whatever it was. I didn't look down to the floor of course, to see what it was, but he was standing there * * *. I didn't know they were scrubbing inside until I got inside. * * * Yes, they had swept out the soapy water and Mr. Hughes had the hose scrubbing the soapy water, coming from the store, out of the door. * * * I saw that soapy water coming out, it looked like Gold Dust water * * * I saw Gold Dust in the ditch before I went in the store.

Q. As it was coming out of the store, you saw how soapy it was? A. Yes, sir.

Q. That soapy water you saw him squirting it in the ditch and that made the sidewalk slippery-like, didn't it? A. Gold Dust always does. * * * The floor was wet. It wasn't—the floor wasn't mopped as dry as a woman would mop it. * * *

Q. When you went through the door, what were they doing inside? A. They were taking and sweeping the water. There was soap suds. When I was standing out there with Mr. Palmison, they were scrubbing the floor and Mr. Hughes went up with his hose and squirted it out, and when I went to go in he was squeegeeing or something, I don't know what it was.

Q. Squeegeeing some of the stuff out of the inside of the store? A. The water and soap suds onto the outside.

Q. Was the squeegeeing from the inside of the store, from the front door? A. Yes, sir.

Q. Then when he got the awful water out of the door, you started to go in? A. No, sir, I waited until he got most of that water out.

Q. Most of it? A. Yes, and he was back there squeegeeing the water out this way.

Q. Then after he got most of it out, you went in? A. Yes, it was pretty dry on this side (indicating).

Q. They were still working there when you went in? A. Yes, but it was not as wet as when I came inside.

Q. And you, I suppose were watching the floor all of the time that you were walking back? A. I wasn't watching the floor. I wanted to get my soup meat so I could get home.

Q. Just before you slipped or fell, or whatever it was, do you remember whether you were looking ahead or looking down? A. I was looking ahead, the same as anybody else would, walking along to see where you were going."

We have set forth the plaintiff's testimony at some length because it clearly indicates that we do not have here a case where the plaintiff was ignorant of the condition of the premises but had full knowledge thereof, nor do we have here a case where some act of scrubbing or mopping was done behind her back after she had entered the store. There is no evidence of any defect in the floor, nothing but a wet and soapy floor of which she had full knowledge, both before and after entering the store. There is no evidence as to what caused her to fall, other than her statement that she slipped and fell, and as said by the Court of Appeals of Cuyahoga County, in the unreported case of Sarah Ferstman v Esther Spiro, decided January 27, 1936, No. 14965, (23 Abs 185) and motion to certify having been overruled by the Supreme Court March 25, 1936:

"So that we have a case that was submitted to the jury without proof of any defect, without proof of what caused the accident other than slipperiness with proof that the floor was wet and had feathers and droppings (in our case soap or Gold Dust and water), and so forth about, with proof that the plaintiff saw and knew all about these conditions prior to passing over them. * * *

"It is also apparent that when she elected to pass over this floor with such full knowledge of the conditions, she assumed the risks." Citing Greyhound Lines, Inc. v Martin, 127 Oh St 499; J. C. Penny Co. v Robison, 128 Oh St 626; S. S. Kresge Co. v Fader, 116 Oh St 718.

Our conclusion is that the court erred in not sustaining the motion for a directed verdict for appellant, and there being no evidence to sustain the verdict, final judgment is entered for appellant.

Judgment reversed and final judgment for appellant.

LLOYD and CARPENTER, JJ, concur.